**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

MARY REID,

    Plaintiff,

       v.

SLEEPY'S, LLC,

    Defendant.

CIVIL ACTION NO. 3:14-CV-2006

(JUDGE CAPUTO)

**MEMORANDUM**

Presently before the Court is a Motion for Summary Judgment (Doc. 27) filed by Defendant Sleepy's, LLC ("Defendant" or "Sleepy's"). In her Complaint, Plaintiff Mary Reid ("Plaintiff" or "Ms. Reid") asserts hostile work environment, sex discrimination, and retaliation claims against Defendant pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII") and the Pennsylvania Human Relations Act, 43 P.S. § 951 *et seq.* ("PHRA"). For the reasons that follow, Defendant's motion will be granted. Judgment will be entered in favor of Defendant on all claims.

**I. Background**

Ms. Reid was first hired to work at Sleepy's as a store assistant in March of 2007. In November of 2007, she was promoted to Mattress Professional, which is the position she held until her termination on April 27, 2013. Ms. Reid worked primarily in the R-24 Region. She was initially assigned to the DC showroom, which is a clearance center, but she hoped to eventually work at the DZ showroom, which is a higher-end, larger volume location and one of the most lucrative stores in the region. Throughout her time as a Mattress Professional, the Regional Manager assigned to the R-24 Region was Thomas Jurlando.

Mattress Professionals, like Ms. Reid, are directly supervised by District Managers. From January 1, 2012 until November 30, 2012, Ms. Reid's District Manager ("DM") was Henry Passion. From December 1, 2012 until April 27, 2013, her DM was Brian Mucci.

Between November 23, 2012 and April 27, 2013, Ron Roberts also worked as a Mattress Professional. At some point prior to July of 2011, Mr. Roberts was a District Manager. However, around July of 2011, he was demoted to a Mattress Professional.

Ms. Reid asserts that Mr. Roberts harassed her on at least five (5) occasions during her time at Sleepy's.  The first time occurred when Mr. Roberts called her while she was working at one of Sleepy's showrooms and he was driving home.  Mr. Roberts told Ms. Reid that he was sexually frustrated with his wife and that he had to finish himself off using his wife's hand.  When Mr. Roberts told her this, Ms. Reid laughed at him.

The second time occurred during a tour of the Simmons plant in Hazleton, which is where Sleepy's mattresses are manufactured.  During this tour, Mr. Roberts propositioned Ms. Reid. This took place some time after July 2011.  After Mr. Roberts propositioned her, Ms. Reid laughed and said "No thanks."

The third time also took place in 2011.  Mr. Roberts told Ms. Reid that "Your ass looks good in those pants, but you need to tighten it up," and then proceeded to show her exercises that she could do.  Ms. Reid testified that although she "didn't appreciate the fact that he told me my ass was sagging," she was not offended by this comment.

The fourth time, which also took place in 2011, occurred when Mr. Roberts told Ms. Reid that she looked great after she had lost some weight.  Ms. Reid testified that she was not offended by this comment.

The fifth time, which will hereinafter be referred to as the "Black Friday Incident," occurred on Friday, November 23, 2012.  On that day, Ms. Reid's friend, Nancy Prendergast, visited Ms. Reid at the DZ showroom with Nancy's friend, Trish.  Although Nancy and Trish were talking to Ms. Reid on the opposite side of the showroom from where Mr. Roberts was working, he came over to them.  Nancy had previously met Ron, but Ms. Reid introduced Trish.  Nancy asked Mr. Roberts if a sex partner could use the same dildo on a different sex partner.  After Nancy asked Mr. Roberts the question, Ms. Reid left to assist a customer that had entered the store.  Mr. Roberts continued talking with Nancy and Trish after Ms. Reid left, responding that it was ok to use the sex toys if they were "washable."

An hour or two after Nancy and Trish left, Mr. Roberts propositioned Ms. Reid, asking her to engage in a relationship that he described as being "fuck buddies."  He suggested that the two of them go to a hotel to have sex, and then described what he wanted to do.  Ms.

2

Reid declined and told him that she was not interested.  Mr. Roberts also explained how he liked her body and how it changed after she lost weight.  After telling him no, Ms. Reid continued working in the showroom with Mr. Roberts for the remainder of her shift, but stayed on the other side of the showroom away from him for the rest of the day.

Initially, Ms. Reid did not intend to report this incident because she feared retaliation.  She knew that other women had complained about Mr. Roberts in the past, but did not believe that any of them were still employed with Sleepy's.  However, she ultimately had a discussion about the incident with her DM, Harry Passion, who asked her what had happened between her and Mr. Roberts.  Ms. Reid initially told Mr. Passion that nothing had happened, but then told him that she would not sleep with Mr. Roberts:

> Q.  What did you tell Mr. Passion during this conversation?
> A.  He initially asked me what happened with me and Ron.  I said, "Nothing."  He again asked, you know, "What happened?  Something happened.  Ron doesn't want you in the store no more."
> And my exact response was, "I won't sleep with him."
> He asked me exactly what happened; and Harry's response was, "Again he's doing this?"

(Doc. 36-6, Pl. Ex. 2, Mary Reid Dep. Tr., at 207:23-208:7.)  During this conversation, Ms. Reid asked Mr. Passion "not to report it."  (*Id.* at 208:12-15.)  Mr. Passion asked Ms. Reid what she wanted him to do about this alleged incident with Mr. Roberts, to which she responded that she would think about it and get back to him.  However, Ms. Reid never got back to him.  Sleepy's ultimately fired Mr. Passion for not reporting Ms. Reid's complaint.

On November 30, 2012, Ms. Reid called HR Director, Kerri DiGirolamo, to report that Mr. Roberts had propositioned her.  Ms. DiGirolamo advised that she would address the matter with management and get back to her.  Mr. Roberts was immediately suspended by Mr. Jurlando pending an investigation into Ms. Reid's complaint.  An investigation was conducted by Brooke Furey, from HR.  Ms. Reid acknowledges that she had no complaints about Ms. Furey's investigation.  After the investigation, it was decided that Mr. Roberts and Ms. Reid would no longer work in the same showroom together, as Ms. Reid expressed concerns about working in the same showroom as Mr. Roberts, but confirmed that she was comfortable working in the same region as Mr. Roberts.  It was also decided that Mr. Roberts

should return to work from his suspension on December 8, 2012.  This decision was made based on the credibility of Mr. Roberts' responses, his demeanor, e-mails received in support of Mr. Roberts from other employees, and Ms. Reid's admission that she was engaging in inappropriate conversations in the workplace.   Additionally, Ms. Furey was unable to corroborate Ms. Reid's claims about Mr. Roberts and determined that Ms. Reid had initiated inappropriate talk in the workplace.

This was not the first time Ms. Reid had complained about Mr. Roberts.  In November of 2008, she complained to HR about Mr. Roberts' "mistreatment and derogatory remarks and behavior."  (Doc. 36-6, Pl. Ex. A, at EEOC 0329.)  Specifically, she complained that Mr. Roberts berated her in a meeting in front of numerous other employees to the point that she was crying hysterically.  (*Id.*)

Mr. Roberts has been the subject of other complaints by female employees while working at Sleepy's.  Some of these complaints are documented in prior litigation against Sleepy's, *Dileo, now by marriage, Chiarelli, v. Sleepy's*, 3:11-cv-1928 (M.D. Pa.) [hereinafter "*Chiarelli* Litigation"], which involved sexual harassment, hostile work environment, and retaliation claims brought by a former female employee, Mary Ann Chiarelli.  Ms. Reid was identified as a witness, subpoenaed, and deposed by Sleepy's in the *Chiraelli* Litigation on March 21, 2013.  The *Chiarelli* Litigation was ultimately resolved through a settlement.

Although Mr. Roberts held the same title as Ms. Reid, Ms. Reid believed that he had influence on Regional Managers and was able to determine where he worked and who he worked with, which was not something that other Mattress Professionals were able to do.  Ms. Reid believed that despite Mr. Roberts' demotion to Mattress Professional, he was still able to influence some of the other DMs because he was friends with them.  Ms. Reid was concerned that other women who have complained about Mr. Roberts in the past, including Niomy Quiles, Mary Ann Dileo, and Regina Moran, were no longer employed with Sleepy's.  Ms. Reid believed that she was one of the only women who had reported Mr. Roberts but was still employed by Sleepy's.

On February 4, 2013, Ms. Reid filed a Charge of Discrimination with the Equal

4

Employment Opportunity Commission ("EEOC"), dual-filed with the Pennsylvania Human Relations Commission ("PHRC").  In this Charge, Ms. Reid explained the Black Friday Incident and also indicated that she had witnessed Mr. Roberts proposition another employee, Jackie Brieling, and observed him pull down the front of her shirt to look down her shirt.  She heard Mr. Roberts comment on the "nice view" when he was looking at Ms. Brieling's backside.  On March 4, 2013, Mr. Jurlando participated in a conference call with executive vice-president Dan Thigpen, DM Brian Mucci, and Brooke Furey and Laura Furnari from HR to discuss Ms. Reid's complaint.

On March 9, 2013, Ms. Reid contacted her DM Brian Mucci to report computer issues that were causing her problems in finalizing two (2) tickets.  When Mattress Professionals sell a mattress, they are required to issue an invoice to the customer.  Customers who elect to pick up their mattresses then may take that invoice, either on the date of sale or a later date, to a Sleepy's location, where the customer will receive the mattress.  That same day, the Mattress Professional is required to "finalize" the invoice in the computer system.  This requirement of same-day finalization of a sale in the computer systems serves two goals: (1) it ensures that the customer is given only as many mattresses as were purchased, since until a ticket is finalized, an unscrupulous customer could take the same invoice to two different locations and obtain two mattresses for the price of one, and (2) Sleepy's Mattress Professionals are paid bonuses based on finalized sales on a weekly basis.  A Mattress Professional who deliberately fails to finalize an invoice on the date of sale could manipulate the bonus process by using an invoice from Week 1 toward a bonus for Week 2.  Sleepy's considers such "bumping" of an invoice to be devious behavior.  Saturday, March 9, 2013, was the last day of the week for purposes of awarding bonuses.  On that day, Ms. Reid failed to finalize two invoices.  She told Mr. Mucci that she was having problems logging in, and he told her to contact the IT department.  Ms. Reid recalls contacting the IT department, but does not recall what happened.  She only recalls that the problem was not resolved and that she does not think she logged out that night.  The next morning, Ms. Reid called Mr. Mucci to tell him that there were two (2) unfinalized invoices at the DC showroom because of her

computer issues.  Mr. Mucci reported the issue to Mr. Jurlando, who contacted the help desk to confirm Ms. Reid's account.  However, he was unable to produce a record of the call.  Ms. Reid was issued a written warning for failing to finalize these tickets by Mr. Jurlando on March 30, 2013.

On April 13, 2013, Anthony Cerullo, a new trainee, e-mailed Mr. Jurlando to advise him of an issue regarding Ms. Reid that occurred while he was working with her in the DZ showroom a few days earlier, on April 11, 2013.  Specifically, he complained that she took his photograph with her phone, and then told him that she was going to send the photograph to all of the other sales people in the district to make sure he didn't "shop" them.[1]  He complained that he was taken back that his photograph was being circulated to people he had never met.  He also complained that she was "smoking in front of the store near the door," which Sleepy's employees are prohibited from doing,[2] and that "the F-Bomb was dropped a few times."  (Doc. 36-44, Pl. Ex. 26, at D004297.)  However, Mr. Cerullo noted in his e-mail that he was not offended by the profanity.

Although protocol dictated that HR would follow up with Mr. Cerullo on Monday, they were not able to get in touch with him that day.  HR did not speak to him about the incident until the next day that he was scheduled for work, which was Wednesday, April 17, 2013.

On April 18, 2013, Laura Furnari, HR Specialist, called Ms. Reid to address various concerns that Defendant had about Ms. Reid.  Ms. Furnari told Ms. Reid that it had been brought to her attention that Ms. Reid was smoking in front of the showroom and that Ms. Reid was continuing to use profanities despite being warned against it back in December.  Ms. Furnari also inquired about the photograph incident with Mr. Cerullo.  Regarding smoking, Ms. Reid admitted that she was smoking outside the front of the showroom but that

---

[1]  "Shopping" someone occurs when an employee poses as a customer to evaluate whether a Sleepy's salesperson is following a company-mandated protocol.

[2]  Sleepy's employees are prohibited from smoking in showrooms and in the entrances and exits.  (Doc. 36-18, Pl. Ex. 10, Thomas Jurlando Dep. Tr., at 74:8-75:12; Doc. 36-42, Pl. Ex. 24, Sleepy's Handbook, at D003018.)

she stood off to the side by a pillar so that she was not right next to the door.  Ms. Furnari informed Ms. Reid that she had to make sure to stay far enough away from the front door so that it does not make customers uncomfortable because it did not make for a good appearance.  Ms. Reid told Ms. Furnari that she understood.  Regarding profanities, Ms. Reid admitted that "yes, I slip.  I try to curb it, but it slips."  (Doc. 36-38, Pl. Ex. 20, at D000013.)  Ms. Furnari informed Ms. Reid that "it cannot slip" and that she had been made aware of this before and must immediately stop using profanities, to which Ms. Reid said okay.  (*Id.*)  Regarding the photograph incident with Mr. Cerullo, Ms. Reid admitted to taking his photograph, and said that "yes, it was more of a joke between me and a coworker . . . It is stupid goofy stuff."  (*Id.*)  Shortly after this call, DM Brian Mucci received a call from Valerie Ferrence, stating that Ms. Reid called her to say that she did not want to split commissions with her next week because she "ratted [her] out to HR."  (*Id.* at D000014.)  Ms. Ferrence denied doing so, to which Ms. Reid responded, "well then it must have been the new guy (Anthony Cerullo)."  (*Id.* at D000014.)  On April 18, 2013, Ms. Reid was issued a final written warning for the incidents detailed in Mr. Cerullo's complaint.

On April 27, 2013, Mr. Jurlando again caught Ms. Reid smoking outside of the DC showroom.  Mr. Jurlando pulled up to Ms. Reid and Michelle Collins, another employee who was outside with her, and told her that she was not permitted to smoke in front of the showroom.  Mr. Jurlando then left, contacted Kerri DiGirolamo, and spoke to Sleepy's in-house counsel, and then returned and fired Ms. Reid.  Although the fact that Ms. Reid was smoking outside of the DC showroom played into Mr. Jurlando's decision to fire her, it was not the only reason.  In explaining why he decided to terminate Ms. Reid's employment, Mr. Jurlando explained that he was bothered by her pattern of gross insubordination:

> Well, I mean, there comes a certain point that enough is enough.  I mean, I'm a very lenient guy, I'm a fair manager, anyone that works with me will tell you that.  But there comes a point where, you know, someone slaps you in the face so many times that, again, enough is enough.
> It wasn't even the fact that she was smoking in front of the store, it was the fact that she repeatedly just gross insubordination [sic] over and over and over again of breaking policies proving that she just didn't care about the rules and she wasn't going to follow them.  And she had – that was her attitude.  What are you going to do to me?  Chance after chance, write-up after write-up, you

know, written warning, final warnings.  And something she had been previously written up for, again, she just didn't care.  I had more important things on my plate than Mary Reid smoking in front of the store.  That's the truth.  My father was ill in the hospital, my family was there with him, I have a job, so I need to get work done.  So I'm going to the store to try to balance both and handle both of my responsibilities, the last thing I wanted to do was have to deal with, you know, someone has that the ability [sic] to follow the rules and keep her job.  She left me no choice.

(Doc. 36-18, Pl. Ex. 10, Thomas Jurlando Dep. Tr., at 72:16-73:17.)

Regarding the smoking accusation, Ms. Reid testified that she was smoking ten (10) to fifteen (15) feet to the left of the front entrance to the DC showroom, at the side of the building.  (Doc. 36-6, Pl. Ex. 2, Mary Reid Dep. Tr., at 106:2-107:23.)  She believed that smoking in this location did not violate any policies because the week or two before, she had walked to the corner of the front and side of the store and asked Mr. Mucci if she could smoke there, to which she testified he said was okay.  (Doc. 36-6, Pl. Ex. 2, Mary Reid Dep. Tr., at 140:23-141:22.)  Ms. Reid also claims that she had smoked in that same location with Bill Gruman and Thomas Jurlando before, and was not disciplined for it.  (*Id.* at 128:5-13.)

Regarding the profanity accusation, Mr. Jurlando cannot recall if he had ever disciplined anyone for using profanity other than Ms. Reid, but noted that he could not recall having seen any other employee use profanity on more than one occasion other than Ms. Reid.  (Doc. 36-18, Pl. Ex. 10, Thomas Jurlando Dep. Tr., at 106:24-108:4, 107:9-19.)

On June 26, 2013, after she was fired, Ms. Reid filed another Charge of Discrimination for the final written warning and termination.  On August 4, 2014, the EEOC issued Right to Sue letters for both Charges.  On October 16, 2014, Ms. Reid filed her Complaint.  (Doc. 1.)  Defendant filed an Answer on January 7, 2015 (Doc. 10), and on November 25, 2015, Defendant filed the instant Motion for Summary Judgment (Doc. 27).  This motion has been fully briefed and is now ripe for disposition.

## II. Discussion

### A.    Legal Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)).  A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. *See Edelman v. Comm'r of Soc. Sec.*, 83 F.3d 68, 70 (3d Cir. 1996).  Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Anderson*, 477 U.S. at 247-48.  An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248.  Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law.  *See Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 251 (3d Cir. 2010).  The moving party may present its own evidence or, where the non-moving party has the burden of proof, simply point out to the court that "the nonmoving party has failed to make a sufficient showing on an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When considering whether there are genuine issues of material fact, the court is required to "examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).  Once the moving party has satisfied its initial burden, the burden shifts to the non-moving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the

facts entitle it to judgment as a matter of law. *Anderson*, 477 U.S. at 256-57. The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

In order to prevail on a motion for summary judgment, the non-moving party must show "specific facts such that a reasonable jury could find in that party's favor, thereby establishing a genuine issue of fact for trial." *Galli v. N.J. Meadowlands Comm'n*, 490 F.3d 265, 270 (3d Cir. 2007) (citing Fed. R. Civ. P. 56(e)). Although the non-moving party's evidence may be either direct or circumstantial, and "need not be as great as a preponderance, the evidence must be more than a scintilla." *Id*. (quoting *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005)). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. There is no issue for trial unless there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Id.*

## B.    Motion to Strike

In opposing Defendant's Motion for Summary Judgment, Plaintiff filed a brief in opposition (Doc. 35) as well as a ninety-page Counterstatement of Material Facts (Doc. 36) ("Counterstatement"). Defendant filed a motion to strike Plaintiff's Counterstatement for failure to comply with Local Rule 56.1. (Doc. 38.) Specifically, Defendant argues that the Counterstatement is not "short and concise" as required by Rule 56.1 and is muddled with argument, equivocations, or non-responsive assertions. Defendant requests that this Court strike Plaintiff's Counterstatement and deem Defendant's submitted facts as admitted.

Rulings on motions to strike are within the sound discretion of the district court. *Matson-Forester v. Allstate Ins. Co.*, No. 12-cv-1838, 2014 WL 580267, at *3 (M.D. Pa. Feb.

12, 2014).  Because striking a pleading is viewed as a drastic remedy, such motions are generally disfavored.  *Newman Bros. Co. v. Albion Eng'g Co.*, 299 F.R.D. 90, 94 (D.N.J. 2014).  Even when the pleading is "redundant, immaterial, impertinent, or scandalous, a motion to strike should not be granted unless the presence of the surplusage will prejudice the adverse party."  *Id.* (citation and internal quotation marks omitted).

Here, Defendant is correct that much of Plaintiff's ninety (90) page Counterstatement, which was filed in response to Defendant's nineteen (19) page Statement of Facts, is non-responsive, irrelevant, and argumentative. However, it does not so clearly violate Local Rule 56.1 or prejudice Defendant in such a way that justifies being stricken from the record or deeming the facts in Defendant's Statement as admitted.  Additionally, the argumentative statements found in Plaintiff's Counterstatement are not as inflammatory as the ones found and stricken in the cases cited by Defendant.  For example, in *Park v. Veasie*, No. 3:09-cv-2177, 2011 WL 1831708 (M.D. Pa. May 11, 2011), Judge Rambo struck both parties' statements of material facts because they were muddled with "inflammatory and argumentative phrases," such as the following:

> 2.    ***Compounding their outrageous acts***, the defendants ***unnecessarily handcuffed*** Mr. Park, ***inexplicably charged*** him with possession of drug paraphernalia, and, ***for good measure***, had his seven year old son taken into "protective custody" solely on the basis of ***wild, imaginary, and wholly unsubstantiated concerns*** for his "safety."

*Id.* at *2 (citing the plaintiffs' statement of material facts).

In contrast, Plaintiff's Counterstatement here, though lengthy, is not muddled with inflammatory phrases such as "outrageous acts" or "wild, imaginary, and wholly unsubstantiated concerns." Although Plaintiff's Counterstatement ***does*** include superfluous responses and fails to comply with Local Rule 56.1, the violation is not so extreme or prejudicial so as to justify being stricken from the record. *See, e.g.*, *Tsosie v. Dunbar*, No. 3-cv-10-2104, 2012 WL 1191642, at *12 n.2 (M.D. Pa. Apr. 10, 2012) (declining to strike the counterstatement of facts, even though it failed to comply with Local Rule 56.1, and

reviewing the submission for relevant disputes of material fact); *see also Matson-Forester*, 2014 WL 580267, at *3 (acknowledging that although the defendant's statement of facts failed to comply with Local Rule 56.1, it was "suitable" enough for "direct and accurate consideration of the [summary judgment] motion" and denying the motion to strike); *Breslin v. Dickinson Twp.*, No. 9-cv-1396, 2012 WL 7177278, at *3 (M.D. Pa. Mar. 23, 2012) (recommending that the motion to strike be denied and reviewing the parties' submission, notwithstanding "the Plaintiffs' principal counter-statement of facts," which "is an 118 page exegesis," that does not "in any way comport[] with Local Rule 56.1's requirement that the statement be 'a separate, short and concise statement of the material facts'"). Moreover, deeming certain facts admitted, as requested by Defendant, "will not assist the court with the 'direct and accurate' consideration of the underlying summary judgment motion because it is possible that some of the facts deemed admitted might be dispositive to some of the serious claims at issue here." *Park*, 2011 WL 1831708, at *4. Accordingly, Defendant's Motion to Strike Plaintiff's Counterstatement will be denied.

## C.    Hostile Work Environment

First, Plaintiff claims that Defendant violated Title VII and the PHRA by subjecting her to a hostile work environment. To prevail on this claim, Plaintiff must show that (1) she suffered intentional discrimination because of her sex, (2) the discrimination was severe or pervasive, (3) the discrimination detrimentally affected her, (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position, and (5) *respondeat superior* liability exists. *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013).

Defendant seeks summary judgment on this claim on several grounds. First, Defendant argues that Plaintiff cannot satisfy the "severe or pervasive" element because only one (1) incident of alleged harassment occurred within the limitations period, and that this one (1) incident alone is insufficient as a matter of law to establish that the harassment was "severe or pervasive." Second, Defendant argues that there is no evidence demonstrating that the alleged harassment detrimentally affected Plaintiff's work or personal life. Third, Defendant argues that no jury could conclude that *respondeat superior* liability

exists because Defendant took prompt remedial action once it learned of the hostile environment.  Because I find that there is insufficient evidence to satisfy the "severe or pervasive" element, Defendant's motion for summary judgment on this claim will be granted.

### 1.    Five Alleged Incidents of Harassment Against Plaintiff

Here, Plaintiff claims that Mr. Roberts made inappropriate, sexual comments to her on at least five (5) specific occasions between 2008 and November 23, 2012.  Defendant argues that only one (1) of these occasions occurred within the limitations period, *i.e.*, within three hundred (300) days of Plaintiff's filing of her Charge of Discrimination on January 31, 2013.  This is the Black Friday Incident that occurred on November 23, 2012, where Mr. Roberts propositioned Plaintiff.  Defendant argues that this incident alone fails as a matter of law to satisfy the "severe or pervasive" element of Plaintiff's hostile work environment claim.  The remaining comments occurred in 2008 and 2011, outside of the limitations period.  In response, Plaintiff disputes that this is the only incident that occurred within the limitations period and asserts that Mr. Roberts has made numerous inappropriate comments to her during the course of their employment together.  Additionally, Plaintiff invokes the continuing violation theory to assert that other incidents falling outside of her limitations period should also be considered in her hostile work environment claim.

First, the only evidence in the record that Plaintiff points to of Mr. Roberts making more than one (1) inappropriate comment to her within the limitations period is her own deposition testimony. (*See* Doc. 36, Counterstatement, ¶ 15.) However, this testimony does not actually show that other inappropriate comments were made within the limitations period. First, Plaintiff cites to her deposition testimony from the *Chiarelli* Litigation:

> Q.    Okay.  The next question is, give me – is there another situation in which Ron Roberts behaved inappropriately in a sexual way towards you?
> A.    Other than 2012?
> Q.    Yes, prior to when we get to the 2012 event.  I'm talking about prior to that.
> A.    There was so many things mentioned.  He said stuff over the years. Most of it you just kind of brushed it off.  The one meeting I remember being at, I came in in yoga pants; and he said, you know, "Your ass looks good in those pants, but you need to tighten it up."

(Doc. 36-20, Pl. Ex. 11, Mary Reid *Chiarelli* Dep. Tr., at 48:10-22.)  Although Plaintiff testified that there "was so many things," she does not testify that they occurred within the limitations period.  And even if she did, there is no evidence or description of what these "many things" were to determine whether they were severe or pervasive.

Second, Plaintiff cites to her deposition testimony from this litigation.  However, she cites only the following excerpt, which actually shows that there were ***not*** more than the five (5) separate occasions listed earlier:

> Q.   Other than the [five] items I listed, do you remember testifying that there were no other occasions when Mr. Roberts made what you regarded as an inappropriate sexual comment?
> A.   At the time, that's all I recalled.  That's what I said.
> Q.   As we sit here today in 2015, can you recall any other occasions when Mr. Roberts made an inappropriate sexual comment to you?
> A.   No.

(Doc. 36-6, Pl. Ex. 2, Mary Reid Dep. Tr., at 256:5-14.)  Only one (1) of these five (5) occasions, the Black Friday Incident, occurred within the limitations period.  Therefore, this testimony also fails to show that there was more than one (1) instance of harassment that occurred within the limitations period.

Additionally, even if Plaintiff's own testimony established that other incidents of harassment occurred within the limitations period, which it does not, her uncorroborated testimony alone is insufficient to survive summary judgment.  *See Solomon v. Society of Automotive Eng'rs*, 41 F. App'x 585, 586 (3d Cir. 2002) ("The District Court correctly rejected all of these [discrimination] allegations, stating that the only evidence in support of these claims was Solomon's own testimony. . . . [A] plaintiff cannot rely on unsupported assertions, speculation, or conclusory allegations to avoid a motion for summary judgment.); *Cridland v. Kmart Corp.*, 929 F. Supp. 2d 377, 389-90 (E.D. Pa. 2013) ("[U]nder Third Circuit precedent, a plaintiff's uncorroborated testimony about discriminatory treatment cannot–on its own–demonstrate invidious intent at the summary judgment stage."); *Fusco v. Bucks Cnty. of Pa.*, No. 08-2082, 2009 WL 4911938, at *11 (E.D. Pa. Dec. 18, 2009) ("The Plaintiff offers no support, beyond her own testimony, to corroborate her claims.").  Accordingly, given the insufficient evidence of harassment toward Plaintiff that occurred within the

14

limitations period, I turn to Plaintiff's next contention that under the continuing violation theory, these otherwise time-barred instances of harassment should still be considered.

### 2.   Continuing Violation Theory

Under the "continuing violation" theory, "discriminatory acts that are not individually actionable may be aggregated to make out a hostile work environment claim." *Mandel*, 706 F.3d at 165.  Such acts "can occur at any time so long as they are linked in a pattern of actions which continues into the applicable limitations period." *Id.* (citations omitted); *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002) (explaining that a court may consider the "entire scope of a hostile work environment claim . . . so long as any act contributing to that hostile environment takes place within the statutory time period").  Here, that period is three hundred (300) days before Plaintiff filed her EEOC claim on January 31, 2013. *Rush v. Scott Specialty Gases*, 113 F.3d 476, 481 (3d Cir. 1997), *abrogated on other grounds*.  To allege a continuing violation, Plaintiff "must show that all acts which constitute the claim are part of the same unlawful employment practice and that at least one act falls within the applicable limitations period." *Mandel*, 706 F.3d at 165-66.

In support of her continuing violation theory, Plaintiff asserts that the Third Circuit has adopted the Fifth Circuit's three-factor test to distinguish between the occurrence of isolated acts of discrimination and a persistent, ongoing pattern:  (1) subject matter, (2) frequency, and (3) permanence.  (Doc. 35, at 22-23 (citing *West v. Phila. Elec. Co.*, 45 F.3d 744, 754-55 (3d Cir. 1995)).)  However, the Third Circuit has since disavowed this test, explaining that the Supreme Court has explicitly rejected the permanence requirement. *See Mandel*, 706 F.3d at 166 (citing *Morgan*, 536 U.S. 101).  The Third Circuit has defined permanence as "whether the nature of the violations should trigger the employee's awareness of the need to assert her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate." *Id.* at 166 n.3.

For example, in *Mandel*, the plaintiff claimed that, throughout her employment, for a period of almost eleven (11) years, she was sexually harassed and discriminated against by male managers and supervisors, such as being referred to as"darling," "the woman," "fluffy,"

"missy," "hon," and "toots"; having her body and clothing commented on; being told that she was "foolish not to use [her] assets"; being told by a Systems Manager, when she asked for directions to a meeting at corporate headquarters, that "[f]or you . . . the meeting will start at my house tonight and we will conclude our part of it tomorrow morning–maybe . . . we may need to postpone the meeting with everyone else a few hours to finish up . . . "; being told by a manager that he fantasized about her while he was having sex with his wife; being told in a review by a Managing Director that she was "too female"; being told to clean the bathroom and make coffee when male employees were not asked to perform such tasks; and being paid less and given less vacation time than a male manager. *Id.* at 161.  Although only one (1) of the alleged incidents occurred within the statute of limitations (*i.e.*, being called a "bitch" during a meeting), the Third Circuit explained that "many of the acts that occurred prior to the applicable limitations period involved ***similar conduct by the same individuals***, suggesting a persistent, ongoing pattern."  *Id.* at 166-67 (emphasis added). Therefore, the Third Circuit reversed the grant of summary judgment for the defendant on the hostile work environment claim and remanded the case for the district court to reexamine the scope of incidents properly considered part of the continuing violation.  *Id.* at 167.

However, the continuing violation theory does not apply if the alleged incidents outside of the limitations period are ***discrete acts*** of alleged discrimination.  *See Hamera v. Cty. of Berks*, 248 F. App'x 422, 424 (3d Cir. 2007) (explaining that the continuing violation theory requires a plaintiff to "establish that the harassment is more than the occurrence of isolated or sporadic acts of intentional discrimination") (citation and internal quotation marks omitted); *see also Hyland v. Smyrna Sch. Dist.*, 608 F. App'x 79, 82 (3d Cir. 2015) (holding that discrete acts of alleged discrimination could not be considered in evaluating the plaintiff's timely discrimination claims).  The relevant distinction is between the occurrence of discrete, isolated acts of discrimination and a persistent on-going pattern.  *West*, 45 F.3d at 755.

Here, the incidents cited by Plaintiff that fall outside of the limitations period are not "discrete" acts but rather, part of a persistent, on-going pattern of discrimination whereby Mr. Roberts harasses other females in an abrasive, crude, derogatory, and inappropriate

fashion.  For example, Plaintiff claims that Mr. Roberts has been the subject of numerous

complaints of inappropriate behavior by female employees while working at Sleepy's:

1.   On July 15, 2008, Sonio (Niomy) Quiles complained of Roberts' **abrasive supervision** and that she felt that he acted like this toward other women as well, although she herself had not witnessed it.  (Doc. 36-13, Roberts Ex. 2, at D02780 (emphasis added).)

2.   On November 8, 2008, he engaged in **abrasive management**. Specifically, he **yelled at [Plaintiff] and made her cry** because she was late to a sales meeting on November 8, 2008.  (Doc. 36-13, Roberts Ex. 4, at D02766; Doc. 36-13, Roberts Ex. 6, at D01929 (emphasis added).)

3.   Mr. Roberts was witnessed **rubbing Jackie Brieling's shoulders** once, which took place for no more than a minute.   (Doc. 36-13, Roberts Ex. 6, at D01929 (emphasis added).)

4.   He received or gave one or more **back scratches or rubs** to Plaintiff. (Doc. 36-13, Roberts Ex. 6, at D01929 (emphasis added).)

These examples of harassment do not appear to represent isolated instances, but an overall

theme of Mr. Roberts' harassing, derogatory, and inappropriate treatment of women at

Sleepy's.  The similar nature of these instances of harassment is highlighted by the fact that

when Plaintiff informed her DM that Mr. Roberts had propositioned her, his response was,

"Again he's doing this?"  (Doc. 36-6, Pl. Ex. 2, Mary Reid Dep. Tr., at 207:23-208:7.)

In arguing that the continuing violation theory does not apply, Defendant emphasizes

that there was at least a 10-month and 22-day gap between the Black Friday Incident and

the last prior act of alleged harassment, which occurred no later than December 31, 2011.

However, the Supreme Court has clarified that the amount of time between acts of

harassment is not critical in determining whether the continuing violation applies.  Rather,

the dispositive issue is whether the acts of harassment are part of the same unlawful

employment practice:

It is precisely because the entire hostile work environment encompasses a single unlawful employment practice that we do not hold, as have some of the Circuits, that the plaintiff may not base a suit on individual acts that occurred outside the statute of limitations unless it would have been unreasonable to expect the plaintiff to sue before the statute ran on such conduct. . . .

The following scenarios illustrate our point: (1) Acts on days 1-400 create a hostile work environment.  The employee files the charge on day 401.  Can the employee recover for that part of the hostile work environment that occurred

17

in the first 100 days?  (2) **Acts contribute to a hostile environment on days 1-100 and on day 401, but there are no acts between days 101-400.  Can the act occurring on day 401 pull the other acts in for the purposes of liability?**  In truth, all other things being equal, there is little difference between the two scenarios as a hostile environment constitutes one "unlawful employment practice" and **it does not matter whether nothing occurred within the intervening 301 days so long as each act is part of the whole**. Nor, if sufficient activity occurred by day 100 to make out a claim, does it matter that the employee knows on that day that an actionable claim happened; on day 401 all incidents are still part of the same claim.

*Morgan*, 536 U.S. at 117-18 (emphases added).

Defendant relies on my decision in *Cortes v. R.I. Enterprises, Inc.*, 95 F. Supp. 2d 255 (M.D. Pa. 2000) to assert that because here, the "interim between alleged incidents . . . even approaches one year, the element of frequency does not exist as a matter of law," and therefore the continuing violation theory cannot apply.  (Doc. 42, at 4.)  However, Defendant misconstrues *Cortes*.  In *Cortes*, my reasoning was based on the presence of a "discrete event," not on a specific amount of time.  *Id.* at 263 ("I find that plaintiff has not alleged a continuous violation because the earlier alleged violations did trigger a ***discrete event*–**plaintiff's leaving her job for a year due to sex discrimination") (emphasis added). Specifically, I found that there was not a continuous violation because the instance of discrimination that occurred outside of the limitations period was a "discrete event," namely, the plaintiff left her job for a year due to sex discrimination.  *Id.*; *see also Morgan*, 536 U.S. at 110 (explaining that "discrete acts" are easy to identify as discriminatory, such as termination, failure to promote, denial of transfer, or refusal to hire); *Stough v. Conductive Techs., Inc.*, 613 F. App'x 145, n.2 (3d Cir. May 19, 2015) ("demotion and failure to promote are 'discrete acts' that 'cannot be aggregated under a continuing violations theory'").

In contrast to *Cortes* and *Stough*, where the continuing violation theory did not apply due to a discrete event such as a resignation or termination, here, there is no similar "discrete event."  Rather, Plaintiff alleges several similar incidents of harassment, such as inappropriate sexual remarks and yelling by Mr. Roberts.  As noted above, the Supreme Court has explained that the passage of time between incidents is of little importance, so long as the incidents are all similar in nature and part of the same unlawful employment

practice. *Morgan*, 536 U.S. at 117-18.  Therefore, I find that the continuing violation applies.

### 3.    Harassment Involving Women Other Than Plaintiff

Defendant also argues that Plaintiff cannot rely on these instances of harassment by Mr. Roberts involving ***other women*** to support her continuing violation theory unless they (1) occurred in close temporal proximity to the harassment targeted at her and (2) were similar in nature and kind to the harassment she experienced.  Defendant adds that even then, she must prove that she witnessed these acts of harassment.

Three (3) factors should be considered in analyzing whether evidence of harassment of people other than the plaintiff may create an inference of discrimination:  (1) whether the harassment against others was committed by the same person who allegedly harassed the plaintiff; (2) whether the harassment against others occurred in close temporal proximity to the harassment targeted at the plaintiff; and (3) whether the harassment against others is similar in nature and kind to that experienced by the plaintiff.  *Velez v. QVC, Inc.*, 227 F. Supp. 2d 384, 413 (E.D. Pa. 2002).  The key inquiry is whether a jury could conclude that "the discrimination of which the plaintiff complains is sufficiently similar in time, nature, and kind to that suffered by other employees."  *Id.*

The first of these factors weighs in favor of considering evidence of harassment against other women because all of these other instances of harassment were committed by the same person who harassed Plaintiff: Mr. Roberts.  However, the second factor weighs against considering evidence of other harassment, since there was a gap of approximately eleven (11) months between the Black Friday Incident and the harassment against the other women cited by Plaintiff.  The third factor weighs in favor of considering this other evidence because all instances of harassment are similar in nature and kind to the harassment experienced by Plaintiff, namely, aggressive, derogatory comments as well as sexually inappropriate remarks.  There is also evidence that Plaintiff witnessed these instances of Mr. Roberts harassing other women at the workplace.  (*See, e.g.*, Doc. 36-45, Pl. Ex. 27, at EEOC0075 (noting that Plaintiff witnessed Mr. Roberts proposition Ms. Brieling and observed him pull down the front of her shirt to look down her shirt and comment on the "nice view").)

19

Accordingly, I find that the continuing violation theory applies to these otherwise time-barred instances of harassment cited by Plaintiff and I will consider them in evaluating her hostile environment claim.

### 4.    Severe or Pervasive

Defendant also argues that even accounting for these alleged incidents that occurred outside of the limitations period, Plaintiff still cannot show that she experienced severe or pervasive harassment.  I agree. To satisfy the "severe or pervasive" element of a hostile work environment claim, "the harassment must be so severe or pervasive that it alters the conditions of the victim's employment and creates an abusive environment." *Weston*, 251 F.3d at 426 (citation omitted).  A court should consider several factors in determining whether an environment is hostile or abusive, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Id.* (citation and internal quotation marks omitted).  "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citations and internal quotation marks omitted).

Courts have found far more egregious behavior than that of Mr. Roberts to be inactionable.  For example, in *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428 (7th Cir. 1995), the plaintiff, in support of her hostile work environment claim, adduced evidence that her employer had over the course of seven (7) months called her a "pretty girl"; made grunting noises as she left his office wearing a leather skirt; told her that his office did not get "hot" until she stepped into it; joked that "all pretty girls [should] run around naked" in the office; likened her to Anita Hill in acknowledging his tendency to share comments of a sexual nature with her at the office; and made gestures suggesting masturbation while conversing. *Id.* at 430.  Despite all this evidence of vulgar and coarse behavior, the Seventh Circuit overturned a jury verdict in the plaintiff's favor, noting that a "handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage."

*Id.* at 431; *see also Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463-65 (6th Cir. 2000) (holding that the conduct in question was not sufficiently severe where female supervisor rubbed an employee's shoulders, grabbed the employee's buttocks, and made other unwelcome contact with the employee's body); *Carattini v. Woods Servs., Inc.*, No. 08-5201, 2010 WL 447453, at *1-*4 (E.D. Pa. Feb. 4, 2010) (finding that where the alleged harasser "grabbed [the plaintiff's] breasts and vagina while both were working in a laundry room," which caused her to scream and run away, "albeit totally inappropriate," was not severe or pervasive); *Saidu-Kamara v. Parkway Corp.*, 155 F. Supp. 2d 436, 439-40 (E.D. Pa. 2001) (granting summary judgment on hostile work environment claim where the plaintiff asserted that her supervisor touched her breast and propositioned her to join him later that evening); *Grady v. Cracker Barrel Old Country Store, Inc.*, No. 4:cv-6-558, 2007 WL 1959298, at *7 (M.D. Pa. July 2, 2007) (granting summary judgment because repeated sexual overtures to the plaintiff were insufficiently severe or pervasive to support hostile environment claim); *McGraw v. Wyeth-Ayerst Labs., Inc.*, No. Civ-96-5780, 1997 WL 799437, at *1, *6 (E.D. Pa. Dec. 30, 1997) (holding that the conduct was not sufficiently severe where supervisor repeatedly asked the plaintiff for a date, took disciplinary action against her when she rebuffed his sexual advances, held her face in his hands on one occasion, and on another forcibly kissed her without her consent).

Here, "[n]one of the acts individually even approach a 'serious' level of offensiveness, and collectively they do not pain a picture of work environment permeated with disturbing harassment." *Lulis v. Barnhart*, 252 F. Supp. 2d 172, 176 (E.D. Pa. 2003) (finding that nine incidents of harassment over a seventeen month period was insufficient to constitute a hostile work environment). Accordingly, Plaintiff has failed to submit sufficient evidence for a reasonable juror to find that the alleged harassment was severe or pervasive enough to constitute a hostile work environment. Given that Plaintiff has failed to establish this element of her claim, I need not engage in an analysis of the remaining elements. *See, e.g.*, *McGraw*, 1997 WL 799437, at *6 (finding that it was unnecessary to reach the other elements of the plaintiff's hostile work environment claim because the severe or pervasive

element was not satisfied and granting summary judgment for the defendant).  Defendant's motion for summary judgment on Plaintiff's hostile environment claim will be granted.

## D.   Disparate Treatment

Plaintiff also raises a disparate treatment claim, also known as a sex discrimination claim, against Defendant.   To state a *prima facie* case for sex discrimination, Plaintiff must show that (1) she was a member of a protected class, (2) she was qualified for her position, (3) she suffered an adverse employment action, and (4) that the action occurred under conditions that give rise to an inference of intentional discrimination. *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008).  The determination of whether a prima facie case has been made is a legal one for the court to decide. *Pivirotto v. Innovative Sys.*, 191 F.3d 344, 347 n.1 (3d Cir. 1999).

Once the prima facie case is established, courts apply the *McDonnell-Douglas* framework, where the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the employment action. *Id.*  The defendant need not prove that the tendered reason ***actually*** motivated his behavior, since throughout the burden-shifting framework, the ultimate burden of proving intentional discrimination always rests with the plaintiff. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994) (citation omitted); *see also Terrell v. City of Harrisburg P.D.*, 549 F. Supp. 2d 671, 681 (M.D. Pa. 2008) ("The defendant is only required to prove that its actions ***could*** have been motivated by the proffered legitimate, nondiscriminatory reason; proof of actual causation is not required.") (emphasis added) (citation omitted).   This burden is "relatively light" and the employer need only introduce evidence which, taken as true, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision. *Fuentes*, 32 F.3d at 763. Once a legitimate reason for the adverse employment action is established, the burden shifts back to the plaintiff to show by a preponderance of the evidence that the employer's proffered reason was pretext. *Makky*, 541 F.3d at 214.

### 1.   Prima Facie Case

For purposes of summary judgment, Defendant concedes that Plaintiff can establish

the first three (3) elements of her discrimination claim:  that she is a member of a protected class, that she was qualified for her position, and that she suffered an adverse employment action.  However, Defendant disputes that she can satisfy the fourth element: an inference of unlawful discrimination.  Specifically, Defendant argues that there is no evidence of intentional discrimination regarding the two (2) adverse decisions allegedly motivated by sex: (1) the reduction in Plaintiff's DZ shifts and (2) Plaintiff's termination.

To demonstrate an inference of discrimination, plaintiffs typically attempt to adduce evidence that the employer treated similarly situated employees from outside of the protected group better.  *Smith v. ABF Freight Sys., Inc.*, No. 1:04-cv-2231, 2007 WL 3231969, at *8 (M.D. Pa. Oct. 29, 2007).  Similarly situated employees are those who "have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.* (citations and internal quotation marks omitted).  Further, "all of the relevant aspects of employment need to be nearly identical." *Id.* (citation omitted).

Defendant argues that Plaintiff cannot point to any instance in which Mr. Jurlando learned of a male employee who (1) got caught "bumping" tickets and then lied to cover his tracks; (2) got caught hazing a new employee and smoking in front of the showroom; and then (3) got caught smoking *again* in front of the showroom–all within the span of one (1) month.  That level of what Mr. Jurlando characterized as "gross insubordination" was unique in the experience of Mr. Jurlando.  Because Plaintiff cannot point to evidence of a male employee who dealt with the same supervisor, was subject to the same standards, and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish his conduct or the employer's treatment of him for it, Defendant argues that Plaintiff's disparate treatment claim must be dismissed as a matter of law.

### a.    Plaintiff's Reduction in DZ Shifts

First, Plaintiff argues that her shifts in the DZ location, which is "one of the most lucrative showrooms" in Sleepy's, were cut in half after she complained about Mr. Roberts.

Plaintiff claims that the record shows that she worked two (2) days in DZ before she complained about Mr. Roberts and after she complained, she was reduced to one (1) day per week in DZ.  This alleged shift reduction is not a form of disparate treatment based on sex, but retaliation for complaining about Mr. Roberts.  More importantly, however, there is no evidence that Plaintiff's shifts at DZ were actually reduced, nonetheless because of her sex, other than her own conclusory assertion in her brief.  First, Plaintiff's own testimony shows that she believed that her hours in the DZ showroom *increased* during the limitations period:

> Q. Okay.  Roughly what percentage of the time in 2013 did you work in the Delta Zulu showroom?
> A. I don't know.  I'm going to guess maybe 30 percent.
> . . .
> Q. In 2012, roughly what percentage of the time did you work in the Delta Zulu showroom?
> A. A small portion.
> Q. Was it more than 10 percent?
> A. I would say maybe 10 percent.

(Doc. 36-6, Pl. Ex. 2, Mary Reid Dep. Tr., at 44:22-45:13.)  Further, Plaintiff testified that she worked approximately two (2) days a week in the DZ showroom, both before and after she complained about Mr. Roberts.  (*Id.* at 197:15-198:10.)

Plaintiff points only to the showroom schedules to support her assertion that her DZ showroom shifts were cut in half after she complained about Mr. Roberts in November 2012.  (Docs. 36-33 & 36-34.)  However, the schedules submitted by Plaintiff are missing weeks 14-17 of 2013.  When the schedules are viewed in their entirety, they show that Ms. Ramos scheduled Plaintiff to work at the DZ showroom *more* after she complained about Mr. Roberts.  (Doc. 42, Ex. A.)  In the five (5) months following Plaintiff's complaint about Mr. Roberts, Plaintiff was scheduled in the DZ showroom twenty-five (25) times (between December 2012 (week 49 of 2012) and April 2013 (week 17 of 2013)) in comparison to only ten (10) times in the five (5) months before she complained about Mr. Roberts (between July 2012 (week 27 of 2012) and November 2012 (week 48 of 2012)).  (D.E. 36-33 & 36-34; Ex. A.)  Both Plaintiff's own testimony and the actual work schedules establish that her

assignments to the DZ showroom were not reduced and in fact, actually were increased. There is no evidence to dispute this fact.

Because there is no evidence that Plaintiff's DZ shifts were reduced, there is no evidence that the decision was motivated by her sex. Accordingly, no reasonable juror could conclude that Defendant discriminated against Plaintiff because of her sex on this basis.

### b.   Plaintiff's Warnings and Termination

Plaintiff also claims that she was issued several warnings, which ultimately resulted in her termination, on the basis of her sex. She claims that an inference of sex discrimination can be drawn because other similarly situated males were treated more favorably. However, there is no evidence in the record to suggest that this was the case.

First, Plaintiff argues that on March 30, 2013, she was issued a written warning by Mr. Jurlando for failing to finalize tickets. Plaintiff argues that the evidence shows that this decision was motivated by her sex. Specifically, Plaintiff points to the fact Mr. Jurlando admitted that he had only disciplined one other employee for failing to finalize a ticket during his eleven-year employment with Sleepy's, and that she was therefore being singled out. However, it is undisputed that this other employee was a male, and instead of issuing him a warning like he did with Plaintiff, Mr. Jurlando fired him. (Doc. 36-18, Pl. Ex. 10, Thomas Jurlando Dep. Tr., at 112:23-113:4.) If anything, the evidence shows that Plaintiff was treated ***more*** favorably than similarly situated male employees.

Second, Plaintiff points to the final written warning that she was issued on April 18, 2013, for the complaint filed by Mr. Cerullo regarding the photograph she took of him as well as her smoking in front of a showroom and her use of profanity. A few weeks later, Mr. Jurlando caught Plaintiff smoking again in front of a showroom, which triggered his decision to fire her. Plaintiff argues that a reasonable juror could conclude that these decisions were motivated by discriminatory animus because other similarly situated male employees were not disciplined in a similar fashion for smoking or using profanity.

First, Plaintiff cannot cite to any similarly situated male who engaged in conduct

similar to hers in taking Mr. Cerullo's photograph and distributing it to all other sales employees in the region.  With regard to smoking, Plaintiff concedes that employees are prohibited from smoking in showrooms and in the entrances and exits.  (Doc. 35, Pl. Opp., at 11.)  Plaintiff only cites to Brian Mucci, who admitted that he "spoke" to another male employee, Steven Groner, about smoking, but he did not discipline him or terminate him.  However, Plaintiff fails to show how Mr. Groner (1) "dealt with the same supervisor" as her or (2) "engaged in the same conduct" as her.  *Smith v. ABF Freight Sys., Inc.*, No. 1:04-cv-2231, 2007 WL 3231969, at *8 (M.D. Pa. Oct. 29, 2007).  For example, Mr. Mucci's treatment of a male employee with regard to smoking does not speak to whether Mr. Jurlando's treatment of Plaintiff with regard to smoking was motivated by a discriminatory animus.  Additionally, Plaintiff does not attempt to explain how Mr. Groner was similarly situated to her.  She does not assert whether he was caught smoking outside of a showroom in violation of policy, like she was.  She only asserts that he had a conversation about smoking, without any additional detail.  For example, she does not claim (or submit any evidence demonstrating) that he was actually caught smoking.  Accordingly, there is no other evidence to show that Mr. Groner or any other similarly situated males were treated more favorably than Plaintiff.

Plaintiff also cites to Mr. Roberts, asserting that he was subject to numerous complaints but not disciplined for his participation in the same conversation that precipitated Plaintiff's verbal warning.  However, Plaintiff cannot simply point to another male employee who received complaints and compare that to her situation, without further identifying how else they were similarly situated, such as who the decision-maker was, what the complaint was for, when the incident occurred, or any defenses Mr. Roberts may have had to the complaint.  As for Plaintiff's assertion that Mr. Roberts was not disciplined for his participation in the same conversation that she was disciplined for, Plaintiff does not reference which conversation she is referring to or what was said.  Presumably, she is referring to the Black Friday Incident, wherein one of Plaintiff's friends asked Mr. Roberts about dildos in Plaintiff's presence.  However, the undisputed fact is that neither Plaintiff nor Mr. Roberts was

disciplined for this conversation.

With regard to profanity, Plaintiff also fails to cite to similarly situated male employees who were treated more favorably than she was. She vaguely refers to a male employee, Aaron King, and states, without support to any record evidence, that he "was not disciplined for his suggestive remark." However, Plaintiff does not explain any details surrounding this "suggestive remark," such as what the remark was, when it was made, who was witness to the remark, or if anyone complained about the remark. Therefore, there is no evidence to suggest that similarly situated male employees were treated more favorably than Plaintiff.

Plaintiff also cites to Eric Stevens, a male salesperson, who admitted to calling himself "*f*ing amazing" in an e-mail to Ms. Reid dated March 18, 2013, but acknowledged that he was not disciplined for it. However, the undisputed evidence shows that this conduct was distinct from Plaintiff's use of profanity in front of Mr. Cerullo. Mr. Stevens testified that based on the conversations he has had with Plaintiff and their familiarity with each other, he knew she would not be offended by his e-mail. (Doc. 36-31, Pl. Ex. 16, Eric Stevens Dep. Tr., at 39-41.) Plaintiff does not dispute this. This is a critical distinction from Plaintiff's use of profanity in front of Mr. Cerullo, a new trainee with whom Plaintiff was not familiar with. In discussing Sleepy's policy regarding profanity, Mr. Jurlando explained the use of profanity in the workplace was not ***per se*** unprofessional, and that one had to consider the setting. (Doc. 36-18, Pl. Ex. 10, Thomas Jurlando Dep. Tr., at 83:9-84:13.) If two (2) co-workers, like Mr. Stevens and Ms. Reid, on occasion used a profanity and were friendly with each other and knew that the other would not be offended, that would not be as serious of a problem as the case with Ms. Reid, where she used profanity "in front of a trainee, which is a person that we just interviewed and hired and brought to the company and have great expectations for." (*Id.* at 84:1-85:4.) The use of profanity in front of Mr. Cerullo, a trainee, was particularly unprofessional and problematic for Sleepy's because they were "trying to put their best foot forward, trying to influence them to do the right thing, to follow the procedures and policies and to be professional." (*Id.*) This was a quite distinct situation from Mr. Stevens' e-mail to Ms. Reid, a co-worker who had been with the company for years and with whom he was

27

comfortable and friendly with.   Therefore, Plaintiff has failed to submit any evidence to suggest an inference that she was discriminated based on her sex or that similarly situated males were treated more favorably than she was.

Additionally, and perhaps most critically, Plaintiff herself admitted that she has no reason to believe that Mr. Jurlando ever acted because of an anti-female bias.  (Doc. 36-6, Pl. Ex. 2, Mary Reid Dep. Tr., at 268:1-5.)  *See also McGovern v. Supermarkets Gen. Corp.*, No. 95-7001, 1996 WL 628586, at *4 (E.D. Pa. Oct. 25, 1996) (granting summary judgment for the defendant because the plaintiff admitted that he had "no reason to believe" that the decisionmaker acted due to unlawful motive).  Accordingly, Defendant's Motion for Summary Judgment on Plaintiff's sex discrimination claim will be granted.

### c.    Harassment Following Plaintiff's Complaint

Finally, Plaintiff argues that "when a woman who complains about sexual harassment is thereafter subjected to harassment based on that complaint, a claim that the harassment constituted sex discrimination will almost always present a question that must be presented to the trier of fact."  (Doc. 35, at 28 (citing *Jensen v. Potter*, 435 F.3d 444, 454 (3d Cir. 2006), *overruled on other grounds*).).  Beyond quoting this passage from *Jensen*, Plaintiff does not expound on this argument.  Regardless, *Jensen* is readily distinguishable from Plaintiff's case.  In *Jensen*, the Third Circuit emphasized a change in behavior toward Plaintiff before and after her complaint of harassment.  Specifically, Plaintiff got along well with her co-workers prior to complaining of harassment from a supervisor, and then after making her complaint, those same co-workers she was previously friendly with then immediately began harassing her.  Under these circumstances, the Third Circuit found that this change in behavior presented an issue of fact for the jury as to whether the harassment following her complaint was motivated by her sex.

However, here, the circumstances are quite different.  Plaintiff does not claim that any co-workers she was previously friendly with then began harassing her after she complained about Mr. Roberts.  The harassment that she experienced from Mr. Roberts occurred both

28

before and after the filing of her complaint.  She also does not claim that there was a change in behavior from any of the supervisors that "disciplined" her after the filing of her complaint.

Therefore, because Plaintiff has failed to submit any evidence from which a reasonable juror could infer that she was unlawfully discriminated based on her sex, summary judgment will be granted in favor of Defendant on this claim.

## 2.      Pretext

Even assuming Plaintiff adduced sufficient evidence to establish a prima facie case of sex discrimination, Plaintiff has failed to show that the proffered legitimate, non-discriminatory reasons for demoting her "w[ere] merely a pretext for unlawful discrimination." *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 319 (3d Cir. 2000).  A plaintiff carries a "difficult burden" in demonstrating pretext.  *Fuentes*, 32 F.3d at 765.  To establish pretext, a plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* at 764.  The plaintiff must show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons."  *Id.* at 765 (citation and internal quotation marks omitted).   The plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer was wise, shrewd, prudent, or competent.  *Id.*

Here, Plaintiff has failed to demonstrate that Defendant's proffered, legitimate reasons for the adverse employment actions were pretextual.  First, Plaintiff asserts that Defendant has not set forth a legitimate non-discriminatory reason for the reduction in her DZ showroom shifts.  However, as explained above, Plaintiff has failed to submit evidence from which a reasonable juror could conclude that there was any reduction in her DZ showroom shifts. Because there is no evidence that this adverse action happened, there is no need for

Defendant to provide any legitimate, non-discriminatory reasons for it.

With regard to Plaintiff's warnings and termination, Defendant has asserted that she was terminated by Mr. Jurlando because of her "gross insubordination," having deliberately and repeatedly ignored the policies he sought to enforce and having ignored the written warning and final written warning she had been issued within the preceding month.  When Mr. Jurlando encountered Plaintiff smoking in front of the DC showroom on April 27, 2013, he did not merely regard her as an employee in violation of the smoking policy, but regarded her decision to smoke in precisely the same place he had told her not to smoke, nine (9) days earlier and via the final written warning, as a slap in the face, evincing utter disregard for the repeated second chances he had given her.  Therefore, the burden shifts to Plaintiff "to prove by a preponderance of the evidence that the legitimate reasons offered by [Sleepy's] are merely a pretext for discrimination." *Terrell v. City of Harrisburg Police Dep't*, 549 F. Supp. 2d 671, 681 (M.D. Pa. 2008).  She must point to evidence that would allow a reasonable jury to conclude "not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." *Jakimowicz v. City of Phila.*, No. 07-3327, 2010 WL 2649890, at *5 (E.D. Pa. June 30, 2010). Plaintiff failed to do this.  Rather, Plaintiff simply claims that she is the only person that Mr. Jurlando ever disciplined for smoking.  First, even assuming this is true, that does not support the conclusion that Mr. Jurlando used the smoking policy as pretext to discriminate against women because there is no evidence of similarly situated men caught for the same conduct that were treated more favorably.  Second, Mr. Jurlando testified that the reason for his decision was not that she was smoking, but the pattern of "gross insubordination," of which Plaintiff's violation of the smoking policy was only one component.

Plaintiff also points to Brian Mucci, who admitted that he "spoke" to a male employee about smoking, but formal discipline was not used.  As explained above, however, absent any evidence of how this male employee was similarly situated to Plaintiff fails to suggest that Mr. Jurlando's decision to discipline Plaintiff for smoking.  Not only does Plaintiff's situation involve a different decision-maker, there are no details regarding the circumstances

of this other male employee, such as was he actually caught smoking or was he just "talked" to about it, where he was caught smoking, when he was caught smoking, and whether he had received a prior warning about not smoking.

Next, Plaintiff asserts that Defendant's argument that she was smoking in "precisely the same place [Mr. Jurlando] had told her not to smoke" is false, and this false representation "clearly demonstrates the pretext that Defendant argues is lacking." (Doc. 35, at 30.)  However, this "criticism[] amount[s] to little more than the schoolground retort, 'Not so,' an approach which," as explained by the Third Circuit, "does not create a material issue of fact." *Fuentes*, 32 F.3d at 766.  Further, even assuming it is true that Mr. Jurlando was mistaken about the locations where Plaintiff was caught smoking, it is not sufficient to show that his proffered reason for her termination was merely wrong, "but that it was so plainly wrong that it cannot have been the employer's real reason." *Jakimowicz*, 2010 WL 2649890, at *5.  "To discredit the employer's proffered reason . . . the plaintiff cannot simply show that the employer's decision was *wrong or mistaken*, since the factual dispute at issue is whether *discriminatory animus* motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes*, 32 F.3d at 765.  The critical issue is not whether Mr. Jurlando interprets the smoking policy correctly or whether, when he caught Plaintiff smoking the second time, he mistakenly thought it was the same location he initially caught her smoking in.  Rather, the issue is whether Mr. Jurlando used the smoking policy as an excuse to discriminate against Plaintiff because of her sex.  Plaintiff has submitted no evidence to suggest that this was the case.

Second, Plaintiff asserts, without citation, that Mr. Jurlando and two (2) other managers "discussed *promoting* [Mr.] Roberts *while the investigation* of Ms. Reid's complaint was pending." (Doc. 35, Pl. Opp., at 31.)  Plaintiff does not provide any authority to show that this consideration would allow a jury to find that Mr. Jurlando's proffered reason for her termination was a pretext for anti-female animus.  Additionally, the undisputed evidence shows that although Mr. Roberts raised his desire of being promoted to Mr. Jurlando numerous times, Mr. Jurlando was *against* the idea and *would not* support Mr.

Roberts to be a district manager.  (Doc. 36-18, Pl. Ex. 10, Thomas Jurlando Dep. Tr., at 65:15-67:22.)  A reasonable juror could not infer an anti-female animus from this, particularly given Plaintiff's own admission that she had no reason to believe that Mr. Jurlando ever acted because of an anti-female bias.  (Doc. 36-6, Pl. Ex. 2, Mary Reid Dep. Tr., at 268:1-5.)

Given the lack of evidence to suggest that Defendant's proffered reasons for Plaintiff's termination were pretextual, Plaintiff has failed to satisfy her "difficult burden" of demonstrating pretext.  *Fuentes*, 32 F.3d at 765; *see also Cridland v. Kmart Corp.*, 929 F. Supp. 2d 377, 390 (E.D. Pa. 2013) (granting summary judgment because Plaintiff "failed to present sufficient evidence from which a reasonable factfinder could find pretext–he neither established a legitimate basis for disbelieving the Kmart's nondiscriminatory explanation for its action, nor presented sufficient evidence to support a finding that individuals at Kmart were driven by invidious intent.").  Accordingly, summary judgment will be entered in favor of Defendant on Plaintiff's disparate treatment claim.

## E.   Retaliation

Finally, Plaintiff raises a retaliation claim against Defendant pursuant to Title VII and the PHRA.  To establish a prima facie case of retaliation, Plaintiff must show that (1) she engaged in protected activity, (2) Defendant took an adverse action against her, and (3) there was a causal connection between her participation in the protected activity and the adverse employment action.  *Motto v. Wal-Mart Stores East, LP*, 563 F. App'x 160, 163 (3d Cir. 2014).  The Supreme Court has recently clarified that, as to the third prong, a plaintiff making a claim of retaliation under Title VII "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2534 (2013).  Once Defendant articulates a non-retaliatory reason for the contested decision(s), Plaintiff must then present evidence that this reason is a pretext for retaliation.  *Id.*

Here, Plaintiff engaged in three (3) forms of protected activity:  (1) her complaints about Mr. Roberts in November 2012, (2) the EEOC Charge of Discrimination she filed on February 4, 2013, and (3) her testimony in another harassment case against

Defendant on March 21, 2013.  *See Motto*, 563 F. App'x at 163 ("It is well-established that activity short of a formal letter of complaint to the EEOC, such as making complaints to management,' can constitute protected conduct.") (citation and internal quotation marks omitted).  Plaintiff asserts that three (3) discrete adverse actions stemmed from these protected activities:  (1) a reduction of her shifts in the DZ showroom, (2) her final written warning, and (3) her subsequent termination.  Defendant argues that her retaliation claim fails as a matter of law because there (1) is no causal link between any of the alleged adverse actions and the alleged protected activity and (2) there is no evidence of pretext.  I agree with Defendant.

### 1.    No Causal Link

First, Plaintiff's retaliation claim fails at the "causation" element of her prima facie case.  Plaintiff has presented no evidence of a causal link between her protected activity and the purported adverse actions taken against her.  In analyzing causation, the Third Circuit has focused on two (2) factors: (1) the temporal proximity between the protected activity and the alleged discrimination and (2) the existence of a pattern of antagonism in the intervening period.  *Hussein v. UPMC Mercy Hosp.*, 466 F. App'x 108, 112 (3d Cir. 2012).  Timing alone will not support a finding of causation unless it is "unusually suggestive."  *Morrissey v. Luzerne Cty. Cmty. Coll.*, 117 F. App'x 809, 816 (3d Cir. 2004); *see also Merrigan v. Aramark Servs., Inc.*, No. 06-5289, 2009 WL 2998362, at *11 (E.D. Pa. Sept. 18, 2009) ("[T]iming alone very rarely suffices to support causation.").

First, as explained above, Plaintiff has failed to submit any evidence to suggest that there was any reduction in her DZ showroom shifts.  Rather, the evidence shows that her DZ shifts actually ***increased*** after she complained about Mr. Roberts.  Because there is no evidence that this adverse action actually occurred, it cannot serve as a basis for Plaintiff's retaliation claim.

As for the remaining adverse employment actions–her final written warning and her termination–Plaintiff relies largely on temporal proximity to establish causation.  Specifically, Plaintiff argues that she received her final written warning on April 18, 2013,

which was two (2) months after she filed her EEOC charge and two (2) weeks after she was deposed in the *Chiarelli* Litigation.  However, taken in its full context, this timing is not unusually suggestive, particularly since her written warning was issued in the aftermath of complaints that Defendant received about her.  In *Motto v. Wal-Mart Stores East, LP*, the Third Circuit held that a period of eleven (11) days between the plaintiff's sexual harassment complaint and his discharge failed to establish causation because the discharge occurred in the aftermath of an incident whereby the plaintiff was accused of having made statements that constituted threats of physical harm, even though this fact was vigorously disputed.  563 F. App'x at 161-63 ("The crux of Motto's causation argument on this appeal is that the short time between his complaint about sexual harassment and his discharge, eleven days, is sufficient by itself to show a causal link. We do not agree.").  The Third Circuit explained that "[t]he timing was dictated by how long it took [management] to properly investigate the situation and reach a decision."  *Id.* at 163.  Thus, the Third Circuit agreed with the district court that the eleven-day period was not unusually suggestive of retaliation and affirmed dismissal of the plaintiff's retaliation claim.  *Id.* at 163-64.

Similarly, here, the two-month period between the filing of Plaintiff's EEOC charge and her final written warning and the two-week period between her final written warning and her *Chiarelli* deposition are not unusually suggestive when taken in their full context because the final written warning was issued in the aftermath of a complaint Defendant received about Plaintiff.  Specifically, the final written warning was issued on April 18, 2013, in the aftermath of Mr. Cerullo's complaint against Plaintiff, which required Defendant to engage in an investigation before taking any disciplinary action.  The complaint was filed with regard to an incident that had occurred only a week earlier, on April 11, 2013, when Mr. Cerullo was working as a new trainee in the DZ showroom with Plaintiff.  Given the time that Defendant needed to investigate this complaint before disciplining Plaintiff and, given that, as noted above, the undisputed evidence shows that Defendant was unable to speak with Mr. Cerullo until April 17, 2013, the day before

34

Plaintiff's final written warning was issued, this timing is not unusually suggestive.

Ms. Reid also notes that on March 30, 2013, she was issued a written warning for an incident that occurred on March 9, 2013, which was approximately a week after her *Chiarelli* deposition on March 21, 2013.  However, again, this timing is not unusually suggestive because the written warning was issued in the aftermath of Plaintiff failing to finalize two (2) tickets before leaving her shift for the night.  An accusation of an employee failing to finalize or "bumping" tickets is a serious one, so serious that the only other person who Mr. Jurlando ever caught "bumping" tickets in his eleven (11) year employment was not simply issued a warning, but fired.  (Doc. 36-18, Pl. Ex. 10, Thomas Jurlando Dep. Tr., at 112:23-113:4.)  This is undisputed.  Although Plaintiff's incident occurred on March 9, 2013, it required an investigation by Defendant into whether Ms. Reid's account of what happened could be corroborated.  For example, Ms. Reid claimed that her failure to finalize her tickets was due to a computer problem and that she called IT for help.  After Mr. Mucci reported this issue to Mr. Jurlando, Mr. Jurlando had to investigate her defense.  Mr. Jurlando contacted the help desk to try and confirm Plaintiff's account that she had called them.  However, he was unable to produce any record of a call.  Therefore, like in *Motto*, when viewed in its full context, the timing of Plaintiff's written warnings and termination are not unusually suggestive.  Because the timing of her written warnings and her termination are not unusually suggestive of retaliation, Plaintiff cannot rely on this timing alone to survive summary judgment. *Morrissey*, 117 F. App'x at 816; *Merrigan*, 2009 WL 2998362, at *11 (holding that the plaintiff's retaliation claim failed as a matter of law because the timing of the termination was not suggestive of retaliation).

When the timing is not unusually suggestive of retaliatory motive, courts may look to the intervening period for other evidence of retaliatory animus, such as a pattern of antagonism.  *Krouse*, 126 F.3d at 504.  Here, Plaintiff submits that she was a victim of a pattern of antagonism based on two (2) e-mails, neither of which were directed to or sent to her.  (Doc. 36, Counterstatement, ¶ 85.)  First, she points to a December 5, 2012 e-

mail from Showroom Manager Valerie McAvoy to Thomas Jurlando.  In this e-mail, which Plaintiff is not copied on, Ms. McAvoy defends Mr. Roberts, stating that she, along with many others, are upset about what has happened to him and Mr. Passion.  (Doc. 36-35, Pl. Ex. 19, Dec. 6, 2012 McAvoy E-mail, at EEOC0232.)  Ms. McAvoy states that Mr. Roberts was always a professional employee and that as far as Ms. Reid goes, "she did not like him, why, I do not know. I know she was upset that he did not choose her as his 2nd in DZ, he requested Eric instead. But [she] has stated to more than one person she hates him. . . . It is a witch hunt, my opinion only." (*Id.*)  Plaintiff points to no evidence showing that this e-mail was sent to her or even brought to her attention, even if only indirectly.  No reasonable juror could conclude that Plaintiff was subjected to a pattern of antagonism based on this e-mail.

The only other evidence Plaintiff points to in support of a pattern of antagonism is a similar e-mail from Aaron King to Mr. Jurlando dated December 4, 2012, offering his opinion on the situation with Mr. Roberts and Ms. Reid.  (Doc. 36-46, Pl. Ex. 28, Dec. 4, 2012 King E-mail, at EEOC0230.)  The entirety of this e-mail, which Plaintiff again is not copied on, reads as follows:

> At this point I know a little bit of what has happen [sic] to Harry and Ron.  I am not sure what the entire story is but I can say that Mary Reid has stressed to me numerous times over my 2 years here at sleepys [sic] that she never liked Ron for what ever reasons [sic].  She litterly [sic] used to say she just flat out hated him.  I worked with her in DC for about 6 or 7 months and heard all kinds of things come from her mouth.  I am not looking to throw anyone under a bus but I dont [sic] like to see someone fry for nothing.  I want you to know that if I can help these guys in any way about the things Mary Reid has even said to me I would gladly speak up.
>
> Aaron King   AK4722
> Mattress Professional

(Doc. 36-46, Pl. Ex. 28, Dec. 4, 2012 King E-mail, at EEOC0230.)  These two (2) emails do not suggest a pattern of antagonism.  Rather, they simply represent the opinions of other employees who privately offered their opinions and further help with the investigation into the conflict between Mr. Roberts and Ms. Reid.  Neither of these e-mails antagonize Ms. Reid in any way.  Plaintiff points to no other evidence to suggest a

pattern of antagonism or retaliatory animus.  Accordingly, Plaintiff has failed to adduce sufficient evidence on the causation element to survive summary judgment.

### 2. Pretext

Even assuming Plaintiff were able to adduce sufficient evidence to establish causation, Plaintiff has failed to adduce sufficient evidence to establish pretext, for many of the same reasons outlined above in the analysis of her disparate treatment claim. Plaintiff argues that the timing of her termination combined with the pretextual explanation for the discipline for smoking is sufficient to establish a prima facie case of retaliation.  Plaintiff relies on *Kellerman v. UPMC St. Margaret*, 317 F. App'x 290 (3d Cir. 2009), to assert that "[i]t is not for a court to decide the significance, if any, of the timing of [the plaintiff's] termination . . . Such disputes must be resolved by a factfinder, and the district court therefore erred in granting summary judgment on the retaliation claim." *Id.* at 293; *see also Romdhani v. Exxon Mobil Corp.*, No. 07-715, 2011 WL 722849, at *16 (D. Del. Feb. 23, 2011) (given the timing of the plaintiff's complaints and her termination, sufficient evidence exists that could lead a reasonable jury to conclude that the reasons are pretext).  However, in *Kellerman*, the Third Circuit's decision that the plaintiff's retaliation claim could survive summary judgment was not based on timing, but additional evidence of pretext:

> ***Whether or not timing alone would be sufficient***, Kellerman has produced additional evidence of pretext.  At the deposition, he testified that he told SMH of his prior employment history at Divine Providence when he first interviewed for the job in March, 2002, but that his failure to include that prior employment on his job application did not become an issue until ***after*** he filed his EEOC complaint.  We agree that the timing of his termination ***combined with evidence of a pretextual explanation*** for his termination is sufficient to establish a *prima facie* case of retaliatory dismissal.

317 F. App'x at 293 (emphases added).  In contrast, here, Plaintiff relies on timing alone. Unlike the plaintiff in *Kellerman*, Plaintiff here does not point to any evidence of a pretextual explanation for the warning she was issued for Mr. Cerullo's complaint of her taking his photograph and distributing it to the entire region, smoking, and use of profanity, nor does she point to any evidence of a pretextual explanation for her

termination.  *Kellerman* was unique in the sense that the reason offered for the plaintiff's termination was something that the defendant was aware of long before any disciplinary action was taken, approximately an entire year earlier, yet the plaintiff was fired for it only weeks after his complaint of sexual harassment.  *Id.* at 293.  Therefore, under those circumstances, the Third Circuit explained that it was for a fact-finder to decide the significance of this timing and when the defendant learned of the plaintiff's prior employment, which was the subject of his termination.  *Id.*  However, here, there is no question of when Defendant learned of Plaintiff's failure to finalize tickets on March 9, 2013, or of Mr. Cerullo's complaint against Plaintiff regarding her taking his photograph, smoking, and use of profanity.  Therefore, *Kellerman* is inapposite.

Plaintiff's reliance on *Romdhani* is similarly misguided.  In *Romdhani*, the plaintiffs submitted evidence that they were treated differently by their supervisors before and after filing their discrimination complaints.  *Romdhani v. Exxon Mobil Corp.*, No. 07-715, 2011 WL 722849, at *15-*16 (D. Del. Feb. 23, 2011).  They also submitted evidence of "an escalating campaign" and threats that "unspecified employment action" would be taken against one of the plaintiffs, who was "***told that her complaints would only make it harder for her in the workplace***."  *Id.* at *15 (emphasis added).  One of the plaintiffs was terminated from her employment "within hours of reporting complaints of sexual harassment to her supervisors."  *Id.*  This incredibly suggestive timing of only a few hours, when viewed in the context of the other evidence of threats and antagonism, raised genuine issues of material fact that made summary judgment on the retaliation claim inappropriate.  *Id.*  However, unlike in *Romdhani*, the timing here is not unusually suggestive and Plaintiff points to no evidence of similar threats and antagonism that would suggest the proffered reasons for her warnings and termination were pretextual.  Therefore, *Romdhani* is similarly inapposite.

Regarding Plaintiff's final written warning, Mr. Jurlando testified that he issued a final written warning to Plaintiff because of her poor judgment and lack of professionalism in using profanity in front of a trainee, someone that the company was trying to make a

good impression on.  (Doc. 36-18, Pl. Ex. 10, Thomas Jurlando Dep. Tr., at 84:1-85:4.)

Plaintiff cannot point to any record evidence suggesting that this reason proffered by Mr.

Jurlando was a lie, much less "so plainly wrong that it cannot have been [his] real

reason."  *Jakimowicz*, 2010 WL 2649890, at *5; *see also Merrigan*, 2009 WL 2998362, at

*11 ("Plaintiff's disagreement with her supervisors' decisions do not demonstrate

discriminatory animus.").  Plaintiff similarly cannot point to any evidence to suggest that

Mr. Jurlando's proffered reason for her termination–her gross pattern of

insubordination–was pretextual.  Accordingly, summary judgment will be entered in favor

of Defendant on these claims.

### III. Conclusion

For the above stated reasons, Defendant's Motion for Summary Judgment will be

granted and Defendant's Motion to Strike will be denied.

An appropriate order follows.


June 16, 2016           /s/ A. Richard Caputo    
Date                A. Richard Caputo
                   United States District Judge